IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| BONNIE RUTH HATTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:16-CV-00276 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
TO AFFIRM THE DECISION OF THE COMMISSIONER**

Plaintiff BONNIE RUTH HATTON (Hatton) brings this cause of action pursuant to 42

U.S.C. § 405(g), seeking review of a final decision of defendant NANCY A. BERRYHILL,

Acting Commissioner of Social Security (Commissioner), denying plaintiff's application for

disability insurance benefits (DIB).  Both parties filed briefs in this matter. For the reasons stated

below, the undersigned United States Magistrate Judge recommends the Commissioner's

decision finding Hatton not disabled and not entitled to benefits be AFFIRMED.

I.
FACTS AND PROCEDURAL RECORD

On or about October 10, 2013, Hatton, who was a few days shy of 26 years old at the

time, filed an application for Title II social security disability benefits alleging she had become

unable to work on October 21, 2009, shortly after her 22nd birthday.  Hatton, in her application,

claimed disability due to the following conditions: an injured spine (back and neck) due to a slip-

and-fall accident at work, migraine headaches from a concussion related to the same fall and

partly to a past history of corrective surgery for Arnold Chiari malformation, depression and anxiety, possible endometriosis or other female issues, obesity, and allergies. (Tr. 260-64; 273-76). Hatton and her administrative trial counsel submitted medical records starting from the date of the slip-and-fall injury in October of 2009 through 2016. Hatton submitted medical records from 2015 and 2016 after the administrative hearing before the Administrative Law Judge (ALJ) that the ALJ considered[1]; however, the ALJ did not review other records submitted in conjunction with Hatton's administrative appeal, although those are contained in the records sent to this Court.

In a Disability Report dated November 22, 2013, Hatton claimed she stopped working on October 28, 2009, shortly after her slip-and-fall accident at Walmart. (Tr. 276). Hatton advised she had completed high school and three years of college. (Tr. 277). She worked as a cake decorator at Walmart from May of 2008 until the 2009 injury occurred, and remained employed by Walmart until October 2013. (Tr. 277). Hatton stated this was her sole employment. *Id*. She described her work duties as a cake decorator to include frequently moving boxes in the freezer up to 30-50 pounds, moving ice buckets between 25-30 pounds, stooping at least 6 hours, standing 8 hours, reaching 8 hours, and occasionally kneeling, crouching, crawling, and climbing. (Tr. 278).

Hatton also completed a Function Report on October 29, 2013, in which she advised she lives with family, including her young daughter. (Tr. 299). Hatton stated her family and her friends assist in the care of her daughter and her household chores. (Tr. 299). She advised she can only prepare meals that take less than 10 minutes to prepare, can dress and shower as long as

---

[1] The ALJ held the record open for a short time after the hearing, based on Hatton's request, to allow her and her counsel to submit additional medical records. (Tr. 165).

no bending is involved, has limited ability to groom herself, does not drive (especially distances over 15 minutes), can do some shopping on her own, and can handle her own finances. (Tr. 299-301). Hatton has given up most of her hobbies and spends her days mostly watching TV in bed or talking and texting on the phone. (Tr. 302). Hatton advised she can only walk 10-15 minutes at one time and then must rest 1 to 4 hours, only sit for 10-15 minutes at one time, and only pay attention for 30 minutes at one time. (Tr. 303). Hatton was prescribed a back brace in 2010, which she uses most of the time. (Tr. 304). Hatton also completed a second Function Report dated December 21, 2013. (Tr. 298-307). This report is substantially the same as her first report.

On January 14, 2014, the Social Security Administration (SSA) denied Hatton disability benefits, finding her combination of conditions not severe enough to keep her from working. (Tr. 177). Further, they found Hatton could perform work at the light exertional level based on the totality of the claimant's medical records. (Tr. 177). On January 29, 2014, Hatton filed a request for reconsideration of the findings. (Tr. 203). The reconsideration included discussion of new evidence, Dr. Daneshfar's 2014 treatment records that Hatton submitted after the ALJ hearing. (Tr. 207). The SSA denied Hatton DIB upon reconsideration and found that all evidence submitted was "not sufficient to support that your conditions were disabling prior to 06/30/2011 when your period of coverage ended." (Tr. 207). The conditions included back, neck, nerve damage, bone spurs, migraines, endometriosis, obesity, allergies, depression, and anxiety. (Tr. 207).

On April 14, 2014, Hatton requested a hearing before the ALJ. (Tr. 208-209). On August 7, 2015, the ALJ held a hearing by videoconference on Hatton's application for DIB. (Tr. 143). Hatton was represented by counsel at the hearing. (Tr. 143). The ALJ obtained numerous medical records prior to the hearing; however, counsel for Hatton informed the court

that a few additional medical records were needed to make the record complete and Hatton's counsel stated he could provide the records within one week of the hearing. (Tr. 143-144). As mentioned previously, the ALJ agreed to hold the record open until he received the medical records before making a decision. (Tr. 144). The ALJ admitted all medical records without objection. (Tr. 144). Hatton's attorney stated this was a worker's compensation case from a slip-and-fall accident and he believe Hatton's exertional level would be found to be less than sedentary. (Tr. 144-145). Hatton testified she went back to work for one week after the accident on a light duty basis, but her entire lower body went numb and she had to stop working permanently after that point. (Tr. 147). Hatton further testified she had impairments based on her back pain (Tr. 147-153), female problems (Tr. 148), and headaches (Tr. 150; 152-153).

At the hearing, Hatton described her functional capacity to the ALJ as follows: can lift 10 pounds for limited amounts of time, sit still for about 20 minutes, stand about 15 minutes without leaning on something, and walk about 10-15 minutes at a time. (Tr. 155). Hatton is not able to care for her dependent child without assistance, primarily from her mother. (Tr. 156). Hatton testified she can perform some light household chores with assistance, she can drive only 10-20 miles at a time, and she can go to the grocery store for limited amounts of time. (Tr. 156-157). Hatton stated she has some days she cannot function at all from the pain, those occurring approximately five days a month. (Tr. 158). Hatton testified that with further treatment and physical therapy she believes she could finish her college degree and be able to work part time, but only if she had better insurance. (Tr. 159).

A vocational expert (VE) also testified at the hearing. Based on Hatton's job description of her only prior work as a cake decorator for Walmart, the VE testified Hatton would no longer be able to perform that type of work based on her Disability Report. (Tr. 161). Based on the

hypothetical presented by the ALJ (which limited claimant to less than sedentary exertional capacity), the VE identified other work in the regional or national level economy in sufficient numbers that such a person could perform. (Tr. 161-162). The ALJ then continued to limit claimant's hypothetical exertional level until the VE testified that no jobs would exist at that decreased exertional level. (Tr. 162). The claimant's attorney also questioned the VE and limited the hypothetical to include all of the limitations described specifically by Hatton, and the VE testified no jobs would exist at that exertional level or at a part-time level. (Tr. 162-164). Specifically, if an individual had to take unscheduled breaks, be absent from work on multiple days per month, or leave her workstation to walk around, no jobs would exist for such an individual. (Tr. 163-164).

After the hearing, the ALJ held the record open for submission of additional medical records. (Tr. 165). Claimant submitted additional medical records that the ALJ considered before issuing his decision. (Tr. 110-139). A total of 585 pages of medical records were obtained and are part of this administrative record. (Tr. 110-139; 339-895). Additionally, claimant obtained 79 pages of additional medical record evidence after the ALJ's decision and submitted those to the Appeals Council. (Tr. 6-85).

On November 4, 2015, the ALJ rendered an unfavorable decision, finding Hatton "was not disabled under sections 216(i) and 223(d) of the Social Security Act through June 30, 2011, the last date insured." (Tr. 104). The ALJ's decision is discussed in further detail below. On December 1, 2015, Hatton requested a review by the Appeals Council of the ALJ's decision. (Tr. 86-87). On October 31, 2016, the Appeals Council denied Hatton's request for review after considering the medical records submitted after the hearing and the ALJ's decision. (Tr. 2). Thus, the ALJ's determination that Hatton was not under a disability during the relevant time

period became the final decision of the Commissioner.  (Tr. 1-4).  Hatton now seeks judicial

review of the denial of DIB benefits pursuant to 42 U.S.C. § 405(g).

II.
MEDICAL RECORDS

A.  Treating Sources

1.  Dr. Randall Hendricks, M.D.: Central States Orthopedic Specialist, Inc.; Tulsa, OK

Hatton began a treating relationship with Dr. Randall Hendricks (Hendricks), an

orthopedic specialist, for the treatment of her spine and neck pain on June 28, 2010.  (Tr. 525).

At that time, Hatton was 22 years old, 230 pounds and had a four-month old baby.  (Tr. 524).

The initial X-rays showed no fracture of the spine, but Hendricks ordered an MRI to better assess

Hatton's ongoing back and leg pain.  (Tr. 524).  Hatton stated her history of neck pain was

mostly resolved at her initial consult with Hendricks.  (Tr. 523).  Hatton received no specific

treatment for her back injury from November 13, 2009 until starting a treating relationship with

Hendricks in mid-2010.  (Tr. 523).

Hendricks referred Hatton to Newman Memorial Hospital where she received an MRI of

her spine without contrast on October 4, 2010.  (Tr. 521).  The MRI showed an L5/S1 endplate

length discrepancy (disk protrusion), slight grade I retrolisthesis, and small posterocentral

extrusion. The radiologist also identified small disc protrusions at L3/4 and L4/5.  (Tr. 520).  On

October 29, 2010, Hatton followed up with Hendricks, who agreed that the L5/S1 protrusion and

the retrolisthesis were significant.  (Tr. 519).  Hendricks recommended an L5-S1 discectomy and

fusion with instrumentation.  (Tr. 519).  At that time, Hendricks found the patient temporarily

and totally disabled.  (Tr. 519).

On December 3, 2010, Hatton underwent her discectomy and fusion with instrumentation. (Tr. 517). On December 17, 2010, Hatton followed up with Hendricks, and the fusion was healing nicely according to X-rays of the spine. (Tr. 515). Hendricks ordered Hatton to increase her activities gradually and to get out and walk. (Tr. 515). On January 28, 2011, Hatton followed up with Hendricks again, this time complaining of site pain and tenderness. (Tr. 513). X-rays were taken and the lumbar fusion was healing; Hendricks recommended trying to increase activities. (Tr. 513).

On February 25, 2011, Hatton again followed up with Hendricks and complained of aggravated back pain from another fall. (Tr. 511). Hendricks found Hatton neurologically intact after X-rays were reviewed. (Tr. 511). Hendricks recommended Hatton wean herself out of the brace and start physical therapy. (Tr. 511). Hendricks decided to order an EMG and nerve conduction study to address Hatton's leg pain. (Tr. 511). Hendricks referred Hatton to Dr. Charles R. Shields, M.D., for the nerve conduction study and EMG, which he performed on March 18, 2011. (Tr. 507). The results of these studies appeared to show no significant peripheral neuropathy. (Tr. 507).

On April 8, 2011, Hatton followed up with Hendricks who reviewed the studies performed by Dr. Shields. (Tr. 505). X-rays were performed, and Hendricks found Hatton to have no substantial deficit, releasing her to work on a light duty basis. (Tr. 505). On June 3, 2011, Hatton appeared with her father at Hendricks' office. (Tr. 503). Radiographs, AP and lateral of the spine showed a solid arthrodesis, and Hendricks believed the hardware used in the fusion could be the cause of Hatton's pain; thus, Hendricks recommended removal of the hardware. (Tr. 503).

On July 5, 2011, Hatton had her hardware removed at the Oklahoma Surgical Hospital. (Tr. 501). Hendricks identified a solid arthrodesis and noted there was no motion upon manipulation of the fusion mass. (Tr. 501). October 10, 2011 was the first time Hatton returned to see Hendricks after her second spine surgery. (Tr. 498). She required two other surgeries in September of 2011 to address feminine problems relating to an ovarian cyst. (Tr. 498). Hendricks found these two surgeries limited her ability to be in aggressive physical therapy following her second back surgery. (Tr. 498).

On February 15, 2012, Hatton followed up with Hendricks, again accompanied by her father, who now stated he was acting as her attorney. (Tr. 495). Hendricks noted Hatton was supposed to follow up at monthly intervals since her visit in October four months prior. (Tr. 495). Hatton failed to show for appointments or reschedule at appropriate times; it was only upon Hendricks sending Hatton a letter informing her she was facing termination as a patient that she showed for her February appointment, which she tried to reschedule for late March. (Tr. 495).[2] Hendricks released Hatton to return to work with a permanent 30-35 pound weight restriction. (Tr. 495, 497). Hendricks also released Hatton from his care on that date, finding she had achieved maximum medical benefit. (Tr. 495).

2. Dr. Bejan Daneshfar: Texas Pain & Spine Institute; Amarillo, TX

Hatton began a treating relationship with Dr. Bejan Daneshfar (Daneshfar) of the Texas Pain & Spine Institute on April 16, 2013. (Tr. 581). Daneshfar noted Hatton had not had a treating physician under worker's compensation since her release from Hendricks's care in

---

[2] In the medical records discussing his final interaction with Hatton, Hendricks noted it was "not in his best interest [as Hatton's doctor] to get into an argument with Hatton's father" about releasing Hatton from his care or releasing her to return to work. (Tr. 495). Hatton claims in her brief that Hendricks had dishonest, non-medical motives for releasing her from his care and that the ALJ had a duty to develop the record as to these motives. Discussed below, this statement by Hendricks at page 495 of the transcript does not give notice to the ALJ that Hendricks's records might be incomplete, nor does it support Hatton's argument that the ALJ had a duty to further develop the record.

February 2012; however, she had seen several other doctors in the interim. (Tr. 581-582). On April 30, 2013, Daneshfar performed an evaluation of Hatton, which included review of X-rays provided by her referring family physician, Dr. Rick Seiwart, taken on September 27, 2012. (Tr. 742). Hatton followed up with Daneshfar on July 23, 2013, and he performed another evaluation of her functioning capacity. (Tr. 743). Hatton was scheduled for a "block" injection to deal with pain. (Tr. 745). Review of the MRI without contrast performed on April 30, 2012, showed a "modest 3 mm posterior disc protrusion at L4/S without significant sac effacement and the central canal is patent. However, there is hypertrophy of the facets, and there is mild narrowing of the foramina at this level." (Tr. 745).

On September 23, 2013, Hatton followed up with Daneshfar. (Tr. 750). Daneshfar performed an examination of the spine and found Hatton did not have "good solid fusion" and had "pars fracture of L4, and fracture at lamina of L3" and she was an appropriate candidate for blocking/injection. (Tr. 752). On October 29, 2013, Daneshfar again examined Hatton and found the injections helped with her pain level. (Tr. 755). On this date, Daneshfar completed a "Physician's Statement/Medical Release" form indicating a permanent disability with the following limitations: 1/3 hour of sitting, 1/4 hour of sitting, 1/3 hour of walking, no climbing, no kneeling, no ladders, no squatting, no bending, no stooping, no pushing, no pulling, and no lifting over 10 pounds. (Tr. 736). Daneshfar indicated that Hatton needed to change positions frequently. (Tr. 736). Daneshfar's handwritten notes indicated Hatton suffered from chronic pain syndrome and "post laminectomy syndrome." (Tr. 737). He noted "at this time" patient is disabled. (Tr. 737). Daneshfar's notes did not indicate the onset of her disability. On January 27, 2014, Hatton followed up with Daneshfar and was in severe pain. (Tr. 758).

B. Examining Sources

1. <u>Dr. Tyler Boone, M.D.: worker's compensation</u>

On April 30, 2012, Hatton underwent an MRI of the lumber spine at Newman Memorial Hospital. (Tr. 678). Dr. Tyler Boone (Boone) reviewed her MRI scan and performed a physical examination of Hatton for worker's compensation purposes. (Tr. 680). Boone noted Hatton was very slow and deliberate in her movements and had diffuse superficial tenderness in the lumbar spine with a well-healed midline lumbosacral incision. (Tr. 680). Boone noted her lumbar range of motion was severely limited. (Tr. 680). Boone was aware of Daneshfar's testing and recommendations, and Boone approved of a spinal block/injection to relieve Hatton's pain. (Tr. 678-680). However, on September 18, 2013, Boone found Hatton "cannot pursue a labor-intensive job and she ought to keep her lifting in the 25-30 pound range, more dependent than stooped." (Tr. 676, 678). Boone did not reach the same conclusions regarding exertional limitations as Daneshfar, despite having reviewed the same medical records. His limitations more closely align with Hendricks.

Boone reviewed Hendricks's films and X-rays from January 2011 and "could not say to a certainty that [he] could see a pars defect." (Tr. 676). Boone reasoned: "it is my feeling that probably the fusion below at L5-S1 caused a stress transfer and either causes a preexisting spondylolysis to become symptomatic or could have ultimately resulted in stress transfer and development of a stress fracture at L4." (Tr. 676). Even with the possible spondylolysis, Boone believed Hatton could perform a non-labor-intensive job. (Tr. 678).

2. <u>Stephen Wilson, M.D.: The Broadway Clinic/Rehabilitation, worker's compensation</u>

Dr. Stephen Wilson (Wilson), M.D., examined Hatton on July 13, 2012 for worker's compensation purposes. (Tr. 554). After examination, Wilson found Hatton "asymptomatic with a normal physical examination." Wilson found Hatton had sustained a 0% permanent

partial disability to her cervical spine, a 10% whole person permanent partial impairment to her thoracic spine, a 55% whole person permanent partial impairment of her lumbar spine, and a 12% whole person permanent partial impairment due to chronic headaches. (Tr. 554). Wilson did not believe Hatton could return to work as a cake decorator but did think Hatton was an excellent candidate for vocational rehabilitation to "help train her in a job consistent with her physical limitations." (Tr. 555).

On August 6, 2014, Wilson provided another worker's compensation evaluation to Hatton that involved reexamination of her physical limitations. (Tr. 867). Wilson noted "since my evaluation [on July 13, 2012] it has been brought to my attention that Ms. Hatton continued to suffer from progressively worsening symptoms and was in need of further evaluation and treatment." (Tr. 867). Although Wilson stated in his opinion that her injuries all related back to her October 21, 2009 slip-and-fall injury, he still found she could perform work in the range identified by Boone. (Tr. 872).

3. Dr. Neil Veggeberg, M.D.: Rehabilitation & Dr. Michael LaGrone, M.D.

Dr. Neil Veggeberg (Veggeberg) examined Hatton on April 16, 2012, and again on September 25, 2012. Veggeberg saw Hatton for rehabilitation and physical therapy following her second spine surgery. (Tr. 557). Veggeberg believed her X-rays showed motion at the L4-5 level and recommended she continue her physical therapy exercises. (Tr. 557). Veggeberg found Hatton was "neurologically … medically stable." (Tr. 557). Veggeberg did not make a medical determination regarding Hatton's ability to perform tasks required for working.

Dr. Michael LaGrone, M.D. (LaGrone) reviewed the medical records from other examining doctors, including Veggeberg, and recommended Hatton have further spinal surgery. (Tr. 764). LaGrone believed she had spondylolysis at L4 prior to her "surgery" which went

unrecognized, and that Hatton currently had spondylolysis.  (Tr. 763-764).  LaGrone made no

findings regarding Hatton's ability to perform work related tasks.

4. <u>Dr. Jeffrey Cone, M.D.: Neurosurgeon</u>

Dr. Jeffrey Cone (Cone) performed Hatton's surgery to correct her Arnold Chiari

decompression of her brain in 1997.  (Tr. 568).  Cone saw Hatton again on November 6, 2012,

after referral from her family doctor.  (Tr. 568).  Cone ordered an MRI of her head and spine.

(Tr. 568).  Cone's findings revealed "normal" scans for her spine and "mild Chiari one

malformation…with no acute abnormality" of her head.  (Tr. 575, 578).  Cone did not express

any findings regarding Hatton's ability to perform work related tasks.

5. <u>Robert Murphey, PAC, Physician's Assistant</u>

Robert Murphey (Murphey), a Physician's Assistant, evaluated Hatton on August 10,

2015.  (Tr. 892-895).  Based on apparently only evaluation and no tests, Murphey completed a

Medical Source Statement.  (Tr. 885).  Murphey listed no medical or clinical findings that

supported his severe limitations in functional capacity he found for Hatton.  (Tr. 889).


C. <u>Non-Examining Sources</u>

1. <u>State Agency Physician Margaret Meyer, M.D.</u>

Dr. Margaret Meyer, M.D. (Meyer) reviewed the medical records available from

Hendricks and the Oklahoma Surgical Hospital where Hatton received care prior to April 18,

2011.  (Tr. 461).  Meyer found Hatton retained light residual functional capacity with additional

postural limitations.  (Tr. 454-461).

2. <u>State Agency Physicians Nancy Childs, M.D. and Leigh McCary, M.D.</u>

Dr. Nancy Childs, M.D. (Childs) reviewed all medical records, including those from treating physician Daneshfar, received prior to January 14, 2014. (Tr. 178). Childs found Hatton retained light residual functional capacity with additional postural limitations. (Tr. 168-178). Childs analyzed the available medical records for considering Hatton's claim at the initial level. (Tr. 168). Dr. Leigh McCary (McCary) considered Hatton's DIB claims upon her request for reconsideration. (Tr. 181-192). McCary concurred with Childs's assessment of Hatton's RFC. (Tr. 191-192).

III.
ALJ OPINION

On November 4, 2015, the ALJ rendered his unfavorable decision, finding Hatton was not disabled as of her date of last insured on June 30, 2011. (Tr. 91-104 – all information in this section cites to these transcript pages). Hatton did not engage in substantial gainful activity during the period from her alleged onset date of October 21, 2009 through her date of last insured on June 30, 2011. The ALJ found the following severe impairments: remote craniotomy for Arnold Chiari syndrome, degenerative disc disease status post back surgery, and obesity. The ALJ also discussed the impairment Hatton suffered from which was not severe, specifically her migraines, which he considered in conjunction with her severe impairments. The ALJ found Hatton's depression and anxiety, or any other mental health issue, to be non-determinable. The ALJ found that none of these impairments met any Listing in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

The ALJ determined Hatton retained the residual functional capacity (RFC) – the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks – to perform less than a full range of sedentary

work.  Specifically, the ALJ found Hatton could "occasionally lift and/or carry 10 pounds and frequently up to 10 pounds.  [Hatton] can stand and/or walk at least 2 hours in an 8-hour workday, sit at least 6 hours in an 8-hour workday. [Hatton] can no more than frequently balance, kneel, crouch, crawl and no more than occasionally stoop."  The ALJ stated that in making this finding, he had considered all evidence in the record, including the exhibits not specifically cited in his decision.

The ALJ discussed Hatton's testimony regarding her impairments and reported pain.  The ALJ listed the factors he considered to assess Hatton's credibility regarding the severity of her pain and impairments and limitations.  The ALJ found "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment during the relevant period."  The ALJ then discussed the above medical records in detail.  The ALJ next found Hatton had no past relevant work, was a younger individual (18-44) on the date of last insured, had a high school education and could communicate in English, and did not have transferability of job skills relevant to his analysis.  The ALJ also found there were jobs existing in significant numbers in the national economy that Hatton could have performed; therefore, Hatton was not under a disability from October 21, 2009 through June 30, 2011.

The ALJ gave specific weights to the opinions of the medical professionals who treated or examined Hatton, as well as the state agency physicians who reviewed Hatton's records and formed opinions based on that review.  This Court must determine if substantial evidence supports the weights given to those opinions.  First, the ALJ considered the opinion of

Hendricks, Hatton's treating specialist during the period she was insured.  The ALJ gave "some weight" to Hendricks's opinion.  The ALJ, in giving less than controlling weight to this opinion, found that other medical evidence in the record indicated Hatton was *more severely* limited than Hendricks initially determined.

The ALJ considered the opinions of state agency physicians Childs and Meyer and accorded them "some, but not great" weight.  The ALJ determined the "whole evidence," including Hatton's subjective complaints and "new and material" evidence limited Hatton to less than light exertional work.  The ALJ accorded Boone's opinions "some weight" based on his examinations for worker's compensation purposes and the fact that his opinions were consistent with Hendricks's opinion regarding Hatton's functional capacity.

The ALJ considered Daneshfar's opinion, Hatton's other treating physician, and accorded it "little weight."  The ALJ found no medical evidence that supported Daneshfar's findings during the relevant period and found the treating relationship did not exist until two years after the date of last insured.  Although the ALJ clearly considered other medical evidence that Hatton was more limited than thought by Hendricks, he did not agree with the severe limitations opined by Daneshfar.  The ALJ noted Wilson's opinion agreed with Boone's restrictions but accorded "little weight" to Wilson's opinions because they were in a worker's compensation capacity some three years after the date of last insured.  Finally, the ALJ considered Murphey's opinion but accorded it no weight, based on the opinion by Murphey some four years after the date of last insured, and the fact that Murphey was not an acceptable medical source.

IV.
ISSUES

1.  Did the ALJ fully and fairly develop the record to give Hatton a fair hearing?

2. Did the ALJ properly weigh Hatton's credibility regarding the severity of her pain and limitations?

3. Were the ALJ's RFC decision and ultimate finding of not disabled supported by substantial evidence?[3]

V.

MERITS

A.  Standard of Review

The function of a district court on judicial review is limited to determining whether there is "substantial evidence" in the record, as a whole, to support the final decision of the Commissioner as trier of fact, and whether the Commissioner applied the appropriate legal standards to evaluate the evidence.  *See* 42 U.S.C. § 405(g); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); *Carriere v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991).  If substantial evidence supports the Commissioner's findings, this Court must affirm them.  *Martinez*, 64 F.3d at 173.

"Substantial evidence" is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  It is more than a scintilla, but may be less than a preponderance.  *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2002).

---

[3] Hatton lists eight issues, seven of them properly consolidated into the issues identified above.  However, Hatton also requests the Court to order Worker's Compensation Units and Walmart to set aside a trust fund under Medicare.  The Court notes this issue is *not* properly before this Court, although the Court's decision may have an impact on the issue based on its findings regarding Hatton's claims for DIB.

A district court may not try the issues *de novo*, re-weigh the evidence, or substitute its own judgment for that of the Commissioner. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. *See Arkansas v. Oklahoma*, 503 U.S. 91, 112-13, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Carey*, 230 F.3d at 135. Any of the Commissioner's findings of fact that are supported by substantial evidence are conclusive. *Ripley*, 67 F.3d at 555. Despite this Court's limited function on review, the Court must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

B.  <u>Applicable Law</u>

In order to be eligible for disability insurance benefits ("DIB") under the Act, a claimant must prove she has a medically determinable physical or mental impairment, or combination thereof, lasting at least 12 months, which prevents her from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered disabled only if her physical or mental impairment (or combination of impairments) is so severe that she is unable to do not only her previous work, but cannot, considering her age, education and work experience, participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which she lives, whether a specific job vacancy exists, or whether she would be hired if she applied for

work. 42 U.S.C. § 1382(a)(3)(B). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501-404.1599, §§ 416.901t-416.988 (1995). The regulations include a five-step process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. 20 C.F.R. §§ 404.1520, 416.920; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

If the ALJ determines that a plaintiff is not disabled under Step Five of the five-part test, the ALJ must establish that the claimant has a "residual functional capacity," given the claimant's age, education, and past work experience, to perform other work available in the national economy. *Leggett v. Chater*, 67 F.3d 558, 564 n.11 (5th Cir. 1995). The four elements of proof weighed to determine whether evidence of disability is substantial are: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).

To be eligible for DIB, a claimant must be insured. *See George v. Chater*, 76 F.3d 675, 676 (5th Cir. 1996) (citing 42 U.S.C. § 423(a)(1)(A)). The claimant bears the burden of establishing a disabling condition before the expiration of his or her insured status. *See Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (citing 42 U.S.C. § 423(a), (c)). Evidence showing degeneration of a condition after the expiration of a claimant's insured status is *not relevant* to the Commissioner's disability analysis. *See Torres v. Shalala*, 48 F.3d 887, 894 n.12 (5th Cir. 1995).

C.  Analysis of ALJ's Decision

1.  The ALJ properly developed the record.

To justify a remand, 42 U.S.C. § 405(g) requires that the evidence is "new" and "material," as well as a showing of "good cause" for failing to provide this evidence at the original proceedings. *See Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989). New evidence is generally evidence that becomes available after the Secretary's decision. *Id.* Reviewing the materiality of new evidence requires the Court to make two separate inquiries: (1) whether the evidence relates to the time period for which the disability benefits were denied, and (2) whether there is a reasonable probability that this new evidence would change the outcome of the Secretary's decision. *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994); *Haywood v. Sullivan*, 888 F.2d 1463, 1471 (5th Cir. 1989); *Bradley v. Bowen*, 809 F.2d 1054, 1057-58 (5th Cir. 1987). Evidence is not material if it relates to a disability or to the deterioration of a previously non-disabling condition resulting *after* the period for which a claimant seeks benefits. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *Haywood*, 888 F.2d at 1471 (emphasis added). Finally, an ALJ's failure to include certain documentation in the record is grounds for reversal only if the applicant can show prejudice. *Brock v. Charter*, 84 F.3d 726, 728 (5th Cir. 1996) (requiring applicant to show that omitted material "might have altered the result").

Hatton claims substantial and material records are "missing" from her administrative records and this is the fault of the ALJ. However, the ALJ is not a mind reader. In this case, there is no indication of underlying issues with Hendricks's records.[4] The ALJ had no reason to suspect the records were incomplete. The ALJ gave Hatton an opportunity to supplement the record after the hearing and also gave her and her attorney the opportunity to bring up any issues

---

[4] Hendricks remarked that he terminated the doctor-client relationship with Hatton because he felt Hatton had reached the full medical benefit of his care. (Tr. 495). Hendricks also expressed concerns with Hatton's failures to follow up on her scheduled appointments and recommended rehabilitation treatments. *Id.* Although Hatton now provides explanations for missing these appointments and she provides her version of events concerning her rehabilitation therapy, all of this information was previously available for her and her counsel to relay to the ALJ at the time of the administrative hearing.

with the record at the hearing on her application.  Hatton has provided NO good cause for her failing to raise the issues with the ALJ in order to put him on notice of allegations she now brings up in her brief (Hendricks's alleged statements to Hatton when releasing her from his care).  She was aware that Hendricks had released her to work and she was aware that the ALJ had these records before him.  Nevertheless, Hatton did not bring up her issues with Hendricks at the hearing and has failed to provide any explanation to this Court why she failed to do so. Hatton argues the ALJ had the duty to "fully develop the record" and to question her about Hendricks's findings, but nothing *in* the record would have put the ALJ on notice that there was anything more to their patient/doctor relationship.  Thus, Hatton's argument that the ALJ should have questioned her about this treatment is unavailing.

2. <u>The ALJ properly weighed Hatton's credibility regarding the severity of her pain and limits.</u>

The ALJ applied the factors in 20 C.F.R. § 404.1529(c) to determine if the severity of Hatton's complaints were supported by the record as a whole.  In fact, the ALJ limited Hatton to less than a full range of sedentary work, a significantly reduced exertional capacity, based in large part on her complaints of pain and limitations.  The ALJ did not discount her testimony entirely; he simply found she retained some capacity beyond her daily activities based on the record as a whole.

The ALJ found Hatton's claims regarding the "intensity, persistence and limiting effects of her symptoms" were not entirely credible.  "It is within the ALJ's discretion to determine the disabling nature of a claimant's pain," and this determination should be accorded "considerable deference."  *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).  This Court should not second-guess a credibility determination so long as substantial evidence supports the ALJ's

ultimate finding. *Hardman v. Colvin*, 820 F.3d 142, 147 (5th Cir. 2016) (citing *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015)).

3. The ALJ's RFC finding and ultimate finding of not disabled is supported by substantial evidence.

The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with … other substantial evidence." *Martinez*, 64 F.3d at 176 (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a specialist generally is accorded "greater weight than that of a non-specialist." *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994). An ALJ is "not required to give controlling weight to a treating physician opinion when … 'there is competing first-hand medical evidence.'" *Walker v. Barnhart*, 158 Fed.Appx. 534, 535 (5th Cir. 2005) (quoting *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)). An ALJ does not err in failing to consider the factors identified in 20 C.F.R. § 404.1527(c) before declining to give controlling weight to a treating physician's opinion in a case with competing first-hand medical evidence because such consideration is required only when there is no other reliable evidence from treating physicians that contradicts the opinion. *See Newton*, 209 F.3d at 453. As long as the ALJ performed his role in weighing conflicting evidence and resolving the conflict, the Court should perform its limited role of ensuring that substantial evidence supports the ALJ's opinion and not reweighing that evidence. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).

The ALJ has sole responsibility for determining a claimant's disability status and is entitled to determine the credibility of medical experts and lay witnesses and weigh their opinions and testimony accordingly. *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). "It is, of course, for the Secretary to decide what weight to accord various medical reports." *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988). Any evaluation of the accuracy of the ALJ's analysis of medical evidence is in large part beyond the scope of this Court's review. *See Fontenot v. Colvin*, 661 Fed.Appx. 274, 277 (5th Cir. 2016). If a plaintiff's argument comes down to the weight the ALJ places on one doctor's report over another doctor's report, it is the ALJ's task, not the Court's task, to weigh evidence. *See Garcia v. Colvin*, 622 Fed.Appx. 405, 408-09 (5th Cir. 2015).

Here Hatton is requesting that the Court substitute its own judgment for that of the ALJ in weighing the medical evidence. Hatton acknowledges repeatedly that Hendricks, her treating physician, as well as other medical doctors, found she could return to work on a light duty basis based on the diagnostic testing, examination, and evaluation of her. Hatton argues the ALJ only gave weight to the "negative" sources, but the record shows otherwise. The ALJ did not give full weight to any medical source stating she could perform light duty exertional tasks. The ALJ considered every medical source offered by Hatton, weighed the evidence, and determined she could perform less than the full range of sedentary work.

An ALJ need only incorporate into the hypothetical question those claimed disabilities "supported by the evidence *and recognized by the ALJ*." *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002) (emphasis added). The ALJ provided the VE with a hypothetical for an individual who could perform less than the full range of sedentary work. The ALJ did not give full weight to the opinion of Daneshfar, finding Hatton totally disabled (which might have been

reasonable to do); nevertheless, this Court cannot reverse and remand the Commissioner's decision finding a claimant not disabled if substantial evidence exists to support the ALJ's determinations. Here, the ALJ gave weight to *competing and contradicting* evidence by other treating and examining physicians, as well as the medical records as a whole and Daneshfar's own examining and treating records, thereby determining that other opinions should be accorded more weight than Daneshfar's opinion. The Court is not permitted to re-weigh this evidence. *See Fontenot*, 661 Fed.Appx. at 277; *Garcia*, 622 Fed.Appx. at 408-09.

## VI.
## RECOMMENDATION

It is the recommendation of the undersigned to the United States Senior District Judge that the decision of the Commissioner finding plaintiff BONNIE RUTH HATTON not disabled and not entitled to disability benefits be AFFIRMED.

## VII.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of these findings, conclusions and recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED on March 1, 2018.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

\* <u>NOTICE OF RIGHT TO OBJECT</u> \*

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are NOTIFIED that the deadline for filing objections is fourteen (14) days for the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14) day after this recommendation is filed** as indicated by the "entered" date.  *See* U.S.C. § 636(b); Fed. R. Civ. P. 72(b); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n,*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

M:DATA\LAR\SS\FCR\Hatton.275.AFFIRM